UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
**CHAIM KAPLAN, et al.,**               )
                                        )
    **Plaintiffs,**                    )
                                        )
v.                                      )       Case No. 09-00646 (RCL)
                                        )
**HEZBOLLAH, et al.,**                  )
                                        )
    **Defendants.**                    )
_____)
_____
**CHAIM KAPLAN, et al.,**               )
                                        )
    **Plaintiffs,**                    )
                                        )
v.                                      )       Case No. 10-00483 (RCL)
                                        )
**THE CENTRAL BANK OF THE**             )
**ISLAMIC REPUBLIC OF IRAN, et al.,**   )
                                        )
    **Defendants.**                    )
_____)

### REPORT OF SPECIAL MASTER
### PURSUANT TO ORDER OF REFERENCE
### REGARDING THE CLAIMS OF
### DVORA KASZENMACHER AND CHAYA ALKAREIF

This action is brought by Dvora Kaszemacher (spelled alternatively in the complaint as "Katzmacher") and her daughter Chaya Alkareif, under 28 U.S.C. § 1605A. Ms. Kaszemacher and Ms. Alkareif are seeking damages for injuries they sustained on July 13, 2006 as a result of a barrage of rockets fired by Hezbollah from Lebanon into northern Israel. In accordance with the Administrative Plan Governing Special Masters and pursuant to the provisions of Federal Rule of Civil Procedure 53, the Special Master has received testimony and reviewed documentary evidence to determine damages to which Dvora Kaszemacher and Chaya Alkareif may be entitled.

**BACKGROUND**

On July 12, 2006, Hezbollah launched a surprise attack against Israel killing eight Israeli Defense Force soldiers and kidnapping two others at the Israeli/Lebanese border. Israel responded with airstrikes against Hezbollah-held positions in Southern Lebanon; Hezbollah retaliated with katyusha rockets and mortars fired against Israeli communities located close to the border. One of those cities was Safed ("Tzfat"). A United Nations-brokered cease-fire took effect on August 14, 2006. *See* U.S. Congressional Research Services, *Lebanon: The Israel-Hamas-Hezbollah Conflict* (RL3356, updated September 15, 2006) by Jeremy M. Sharp.

**The Islamic Republic of Iran**

The statutory scheme underpinning actions against the Islamic Republic of Iran has been exhaustively recounted in *In re: Islamic Republic of Iran Terrorism Litigation*, 659 F.Supp.2d 31 (D.D.C. 2009), obviating the need for recapitulation. This Court has repeatedly found defendants Islamic Republic of Iran and its Ministry of Information and Security legally responsible for facilitating, financing and providing material financial and logistical support to help carry out attacks on United States citizens. *See*, *e.g.*, *O'Brien v. Islamic Republic of Iran*, 853 F.Supp.2d 44, 45-46 (D.D.C. 2012); *Valore v. Islamic Republic of Iran*, 478 F.Supp.2d 101, 110 (D.D.C. 2007) ("*Valore I*"); *Estate of Heiser v. Islamic Republic of Iran*, 466 F.Supp.2d 229, 254 (D.D.C. 2006) (*Heiser I*); *Peterson v. Islamic Republic of Iran*, 264 F.Supp.2d 46, 61 (D.D.C. 2003) ("*Peterson I*"). This Court found so in this case, as well. *See* Memorandum Opinion (July 23, 2014), at 2 (Case No. 1:10-cv-00483 (ECF No. 54)) ("July 23 Memorandum").

**The Democratic People's Republic of Korea**

In 1988, the State Department designated the Democratic People's Republic of Korea ("North Korea") as a "state sponsor of terrorism." *See Notice, Determination Pursuant to*

*Section 6(j) of the Export Administration Act of 1979; North Korea*, 53 Fed. Reg. 3477 (Feb. 5, 1988). The State Department subsequently rescinded that designation on June 26, 2008. *See Certification of Rescission of North Korea's Designation as a State Sponsor of Terrorism*, 73 Fed. Reg. 37351. Courts have held North Korea responsible for offering direct support to terrorist organizations that have carried out attacks in Israel. S*ee, e.g., Calderon-Cardona v. Dem. People's Republic of Korea*, 723 F. Supp. 2d 441, 452 (D.P.R. 2010); *Massie v. Government of Democratic People's Republic of Korea* 592 F.Supp.2d 57, 73 (D.D.C. 2008). In the July 23 Memorandum, this Court found that North Korea provided "material aid to Hezbollah in three ways: weapons, training, and tunnels to help carry out the attacks." July 23 Memorandum, at 6.

**PROCEDURAL HISTORY**

Based on the events of July and August, 2006, Plaintiffs filed a complaint on April 8, 2009 against Hezbollah under the Antiterrorism Act, 18 U.S.C. § 2333(a), and against North Korea under the Foreign Sovereign Immunities Act, 28 U.S.C. § 1605A(c) (Case No. 1:09-cv-00646 (ECF No.1)). On March 23, 2010, Plaintiffs filed a second complaint, this time against the Central Bank of the Islamic Republic of Iran; Bank Saderat, Iran; Bank Saderat, PLC and the Islamic Republic of Iran, alleging these entities provided "extensive material support and resources to Hezbollah, that caused, enabled and facilitated" the Hezbollah rocket attacks. Plaintiffs are asking for damages under 28 U.S.C. §§1605A(c) and (d) and 18 U.S.C. § 2333(a) (Case No. 1:10-00483 (ECF No. 3)). This Court subsequently dismissed the statutory claims against Hezbollah on August 20, 2013, (09-646 (ECF No. 50)), and against Bank Saderat of Iran and Bank Saderat, PLC on November 5, 2010 (10-483 (EFC No. 16)). On August 20, 2015, plaintiffs voluntarily dismissed their common-law claims against Hezbollah (09-646 (ECF No. 63)).

Neither North Korea nor Iran responded to the complaints and plaintiffs subsequently moved for entry of default on May 12, 2014 (09-646 (ECF No. 53) and 10-483 (ECF No. 51)). A hearing was convened on May 27, 2014 to determine defendants' liability during which plaintiffs produced expert witnesses who, in accordance with 28 U.S.C. § 1608(e) (requiring plaintiffs to establish their right to relief by "evidence that is satisfactory to the court"), attested to Iran's and North Korea's complicity in Hezbollah's 2006 attacks against Israel. Based on this testimony, the Court entered judgment by default against the two nations (09-646 (ECF No. 57) and 10-483 (ECF No. 54)).

On October 1, 2014, this Court appointed the undersigned as special master to be governed by the Administrative Plan Governing Special Masters previously adopted in *O'Brien v. Islamic Republic of Iran*, Case No. 1:06-cv-0690 (RCL). *See* 09-646 (ECF No. 58) and 10-483 (EFC No. 55)) ("Order of Reference"). The Court specifically directed the Special Master to issue reports recommending the amount of compensatory damages to which he believed each plaintiff was entitled and to "take and report on evidence of each plaintiff's qualification for relief under § 1605A(c) and the familial relationships between plaintiffs and victims of the rocket attacks in Israel committed between July 12, 2006 and August 14, 2006." *Id.*

Pursuant to these directives and in keeping with the Federal Rules of Evidence, the Special Master makes these findings and recommendations.

**FINDINGS OF FACT**

1. Dvora Kaszemacher was born on June 20, 1950 in Maryland. A copy of her passport, filed with this Court on May 10, 2012, confirms that, at all relevant times Ms. Kaszemacher was a United States citizen.

2. Chaya Alkareif was born in Israel on February 13, 1990. A copy of her passport, filed with this Court on May 10, 2012, confirms that, at all relevant times Ms. Alkareif was a United States citizen.

3. Dvora and Chaya resided in Tzfat at the time of the Hezbollah rocket attacks in 2006.

**Testimony of Dvora Kaszemacher**

Dvora Kaszemacher provided her testimony by Declaration dated March 29, 2012. *See Lanny J. Davis & Associates LLC v. Republic of Equatorial Guinea*, 962 F.Supp.2d 152, 163 (D.D.C. 2013) (accepting proof of damages under the Foreign Sovereign Immunities Act by affidavit and documentary evidence). Dvora affirms she is a United States citizen who currently resides in Tzfat, Israel. She was married on March 1, 1987 to Jacob Kaszemacher who passed away on July 27, 2011. Dvora is the mother of two children and step-mother to the three children born to Jacob with his first wife. Chaya, her youngest, was the only child living at home with Dvora and Jacob in the summer of 2006. At the time, Jacob and Dvora owned an art gallery in Tzfat.

According to her Declaration, Dvora heard the "whistling and the explosion" of the first rocket which landed in Tzfat on July 13, 2006, as well as several others which "fell in the vicinity of [her] home." She and her husband, "a Holocaust survivor, [] were very concerned about what this meant for us as a family and as a community" and discussed whether they should remain in Tzfat or flee south.

During a break in the attack, Dvora asked Chaya to deliver groceries to her daughter-in-law who lived nearby. While Chaya was out, Dvora heard "the sharpest, loudest and most piercing shrill of a whistle which was a katyusha rocket flying through the air and then impacting

- 5 -

nearby." She testified being: "so very frightened that my daughter might have been injured. That sense of fear and being out of control is one that I will not easily forget." Dvora later learned the rocket had "fallen not too far from Chaya when she was on her way to drop off the groceries." She recalls that Chaya, although not hurt, was "very scared and shaken from the incident, having a rocket hit so close to her and the feeling that she was about to die."

Following that episode, "Chaya became anxious and nervous." The rocket attacks forced Chaya to stay in the house that summer since the camp she was scheduled to attend was cancelled. "Within a week or two," Dvora recalls, "the fear, stress and insecurity of what could happen next was too much for Chaya to bear and she, too, went to stay with different friends in other, safer parts of the country." Dvora describes Chaya as a "different person immediately after the incident with the katyusha rocket." Specifically, Chaya was "less ambitious in school, her ability to concentrate was significantly diminished and her zeal for life had been dampened." According to Dvora, Chaya "was supposed to attend a school in England but decided against it because she didn't want to be too far from family."

Dvora and Jacob remained in Tzfat for the remainder of the war during which time they temporarily shuttered their gallery. Dvora recounts how,

> [w]ith the onset of the katyusha rockets flying in from Lebanon, the tourists disappeared overnight and so did our income. We were required to shut the gallery. Not only was this income necessary to support myself, husband and Chaya, but my husband also helped financially support our older married children – one of whom had six children of his own and a pregnant wife.

Dvora was confronted not only with the financial implications of the gallery being closed but with Jacob's distress, as well. The impact of these events coupled with "being cooped up in the house," and "not being sure" of her other children's safety, "affected [her] greatly." Dvora describes spending "many days" trying to find accommodations for her son's large family so

- 6 -

they might escape the danger. Dvora explains, "this caused me undue stress and worry since it was so hard to help from afar." On several of the rare occasions she and Jacob did venture outside, Dvora recalls bomb sirens going off. Knowing her husband was not one to follow "emergency protocols," Dvora was "petrif[ied]," "constantly fear[ing]" that Jacob's complaisance "might cost him his life." According to Dvora, the war left her feeling "depressed at times" and whenever she hears civil defense sirens, she automatically goes into "emergency mode." Dvora concludes, "the impact of the war was life altering for me and my family, the consequences of what happened will surely stay with us for the rest of our lives."

### Supplemental Declaration of Dvora Kaszemacher

On July 15, 2012, Dvora provided the Special Master with a Supplemental Declaration focusing on the family's loss of income as a result of the 2006 rocket attacks. Attached to the Supplemental Declaration, Dvora included what she characterizes as three "balance sheets," written in Hebrew, which purport to reflect "the business' income during the years 2005, 2006 and 2007 . . . broken down by month." Dvora explains that the balance sheets "were made at or near the time, from information transmitted by myself and my husband to our certified accountant at that time. As owners, we are people with knowledge."

According to Dvora, these records reflect: "the total income" for July – August 2005 "equaled 76,710 NIS" (New Israel Shekels); "the total income" for the same period in 2006 was "41,479 NIS"; "the total income" for the same period in 2007 was "92,257 NIS." She offers that "the business was trending upwards," and that by "averaging the income generated during July – August period of 2005 and 2007" she calculates "the loss in prospective income" to be "45,004 NIS" in 2006 or "USD $11,753.98."

**Corrected Supplemental Declaration of Dvora Kaszemacher**

On February 3, 2016, Dvora submitted a Corrected Supplemental Declaration containing essentially the identical narrative as in the original but with revised calculations and no supporting documentation.

In her Corrected Supplemental Declaration, Dvora states: "the total income for July – August 2005" "equaled 36,142 NIS"; the "total income for the same period in 2006 "equaled 16,452 NIS"; the total income for the same period in 2007 "equaled 92,257 NIS."  Averaging the income generated in July – August 2005 and for the same period in 2007, Dvora estimates the gallery's "loss in prospective income" to be "47,747.50 NIS" or "USD $12,470.62."

**Second Corrected Supplemental Declaration of Dvora Kazsemacher**

On March 17, 2016, Dvora submitted a Second Corrected Supplemental Declaration to which she attached: a letter from the gallery's accountant Za'Av Bartel, dated March 16, 2016; an English translation of Mr. Bartel's letter; as well as "spreadsheets for 2005 – 2007," which Mr. Bartel "certif[ies]" to be "accurate" and containing "the identical financial data supplied to the Israeli tax authorities."  The categories of income and expenses set out in these spreadsheets are rendered in Hebrew with no accompanying translation.

In her Second Corrected Supplemental Declaration, Dvora adjusts the loss calculations from those set out in her previous submissions:  She now represents that, "the total income" for July – August 2007 was "88,398 NIS"; the "average of the July – August period of 2005 and 2007" was "62,270 NIS"; and the "loss in prospective income" for the same period in 2006 to be "45,818 NIS" or "USD $11,966.67," based on the conversion rate at the time Dvora submitted her declaration.

**TESTIMONY OF CHAYA ALKAREIF**

Chaya Alkareif testified by Declaration dated March 28, 2012. She affirms that she is an American citizen born in Tzfat, Israel on February 13, 1990. At the time of the Hezbollah incursion, Chaya was 16 years old, living with her parents, Dvora and Jacob. Her siblings, all married at the time, "also lived in Tzfat, not too far" from the Kaszemacher residence.

According to her Declaration, Chaya was at home on July 13, 2006 when the first rocket attacks occurred. She "heard the loud boom" and although she "realized that this was the possible start of a war," she remembers being "pre-occupied with regular teenage concerns of going out with friends and shopping for new clothes." During a lull in the rocket fire, Dvora asked Chaya and a friend, who was with Chaya at the time, to take some milk and bread to her "sister who lived nearby." Before leaving the house, Dvora cautioned Chaya that if they heard a siren, it "meant that a rocket was coming" and they "should find a place to hide, make [them]selves as small as possible and cover [their] neck[s]" with their hands." Chaya and her friend ran to her sister's house hand-in-hand. On her return, Chaya heard a "loud, shrill whistle of a katyusha rocket." Chaya recalls being, "in a narrow street" at the time and "frantically" finding "a narrow side alley to run into for shelter." She testifies: "I had never been in such a stressful situation before; I had to decide in less than a split second where would be the safest place to hide."

As Chaya and her friend huddled together, Chaya realized they had unknowingly situated themselves near two gas canisters. "At that point I thought that the rocket would land right on top of us and that we would just die on the spot as we exploded with the two gas canisters." Chaya recalls feeling bad that her parents would have nothing left of her body to bury. She saw her "life pass before [her] eyes" and "couldn't understand why I was only given sixteen years to

- 9 -

live; that is how close to death I felt." After hearing the bomb land nearby, Chaya and her friend raced back home to find Dvora "hysterically crying" out of fear that Chaya might have been hurt.

For the next several weeks, Chaya remained indoors with her parents. She testifies: "I was very scared and anxious every time I heard of katyusha rocket. I was stressed out and was crying to my mother most of the time." Chaya recalls how she and her parents "sat glued, day and night, to the computer and news to get daily updated as to the war status," which "only added to the stressful, anxious environment we were now living in." She witnessed her father's stress over the loss of business the absence of tourists. Chaya seized an opportunity to stay with friends in Jerusalem, although during her time away from home, she remained "worried and anxious" about her parents safety and called them several times a day. Chaya returned to Tzfat after the cease-fire.

Chaya describes herself a "changed person" since the attacks. She testifies: "As I waited for the rocket to land thinking that I was going to be killed, I was robbed of my innocence." To this day, Chaya finds it "extremely difficult and painful" to return to Tzfat and to pass by the spot where she took cover waiting for a rocket to land. Her "panic and stress" are evident even when she is not in Tzfat. Chaya describes how, prior to the war, she feared nothing, but now is scared when she hears "alarms or loud noises that sound like bombs." She testifies that, "[n]o matter how many years have gone by since the War, I re-live everything on the anniversary date. The flashbacks are frighteningly real; these are things that I fear I will carry with me for the rest of my life."

## ANALYSIS

Plaintiffs, in their complaints, seek damages under 28 U.S.C. §§ 1605A(c) and (d) for harms and injuries resulting from Defendants' "extreme, wanton, willful and malicious" conduct

(09-646 (ECF No. 1) and 10-483 (ECF No. 3)), including "disfigurement; loss of physical and mental functions; extreme pain and suffering; loss of guidance, companionship and society; loss of consortium; severe emotional distress and mental anguish; and loss of solatium" (10-483 (ECF No. 3)).

It is beyond the remit of the Special Master to consider the viability of plaintiffs' common-law claims, much less ascribe damages for any breach thereof. Rather, the Special Master's inquiry is confined to analyzing plaintiffs' entitlement to those damages delineated in the Foreign Sovereign Immunities Act ("FSIA"), namely, pain and suffering, solatium and economic damages. 28 U.S.C. 1605A(c)(4).

To recover under the FSIA, a "default winner must prove damages 'in the same manner and to the same extent' as any other default winner." *Hill v. Republic of Iraq,* 328 F.3d 680, 683-84 (D.C. Cir. 2003) (citation omitted). In the context of a default judgment, courts in this jurisdiction carve a "'clear distinction' in the standard of proof necessary to establish a plaintiff's *entitlement* to damages and to assess the *amount* of those damages." *Rhodes v. U.S.*, 967 F.Supp.2d 246, 313 (D.D.C. 2013) (emphasis in original) (quoting *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 562 (1931)). Accordingly, plaintiffs must prove future damages to a "reasonable certainty," or by a preponderance of the evidence, and must prove the amount of damages by a "reasonable estimate." *Hill*, at 684. For past losses, a plaintiff must, similarly, "prove the fact of injury with reasonable certainty," *Samaritan Inns, Inc. v. District of Columbia*, 114 F.3d 1227, 1235 (D.C. Cir. 1997), yet need only "reasonably prove" the amount of damages. *Hill*, at 684. In fashioning an award, the Special Master may consider any "special problems of proof arising from the defendant's absence." *Id.*, at 685.

Upon consideration of the facts presented, and in light of the aforementioned legal framework, the Special Master finds, for the reasons set out below: (1) that Dvora and Chaya are each entitled to compensatory damages for pain and suffering; (2) that Dvora and Chaya are each entitled to solatium damages; and (3) that Dvora is entitled to economic damages.

### Pain and Suffering

In determining a proper damage award for Dvora Kaszemacher and Chaya Alkareif, the Special Master is guided by prior decisions awarding damages to victims of terrorism, mindful of the inherent difficulty in "assess[ing] the amount of compensatory damages for the pain and suffering of surviving victims of terrorist attacks, especially where severe mental anguish is involved." *Valencia v. Islamic Republic of Iran*, 774 F.Supp.2d 1, 14 (D.D.C. 2010). The Special Master is similarly cognizant that previous damages awards, while instructive guidelines, "are not set in stone," *Murphy v. Islamic Republic of Iran*, 740 F.Supp.2d 51, 74 (D.D.C. 2010), and that "strict application of precedent could lead to conflicting conclusions about an appropriate award." *Brewer v. Islamic Republic of Iran*, 664 F.Supp.2d 43, 57 (D.D.C. 2009) (*quoting Blais v. Islamic Republic of Iran*, 459 F.Supp.2d 40, 59 (D.D.C. 2006)).

Courts consider a "myriad of factors" when assessing damages for surviving victims of terrorist hostilities including "the severity of the pain immediately following the injury, the length of hospitalization, and the extent of the impairment that will remain with the victim for the rest of his or her life." *Peterson v. Islamic Republic of Iran* ("*Peterson II*"), 515 F.Supp.2d 25, 52 n. 26 (D.D.C. 2007) (citing *Blais*, 459 F.Supp.2d at 59). Calculating these damages begins with the baseline assumption that persons suffering injuries in terrorist attacks are entitled to $5 million in damages." *Davis v. Islamic Republic of Iran*, 882 F.Supp.2d 7 (D.D.C. 2012) (citing *Peterson II*). This amount serves as a lodestar and can deviate upward in the presence of

"severe instances of physical and psychological pain, such as where victims suffered relatively more numerous and severe injuries, were rendered quadriplegic, partially lost vision and hearing, or were mistaken for dead," *Valore v. Islamic Republic of Iran*, 700 F.Supp.2d 52, 84 (D.D.C. 2010) ("*Valore II*"), or downward in the face of "minor shrapnel injuries or minor injury from small-arms fire." *Id.*

The Special Master finds that Dvora Kaszemacher and Chaya Alkareif, through testimony and supporting documentation, have established a cause of action and demonstrated a right to recover against the defendants. The record amply reflects that the two-month siege by Hezbollah was emotionally devastating for them.

Dvora attests to her "concern" and anxiety when the first rockets hit. She recounts being "very frightened" when she thought her daughter was outside during a rocket attack and how "[t]hat sense of fear and being out or control is one that [she] will not easily forget." Chaya confirms that, upon her return that day, she found her mother "hysterically crying." Dvora describes her stress attempting to find secure quarters for her son and his family and being "petrified" when her husband would venture outside. She testifies feeling "depressed at times" and characterizes the impact of the war as "life altering."

Chaya's trauma is equally well documented. She recalls her "stressful situation" being outside during a rocket attack," seeing her "life pass before" her eyes and hoping her death "would be quick and hopefully painless." She describes her difficulty returning to Tzfat and how she remains stricken by "panic and stress" and frightened when she hears "alarms or loud noises."

For victims who "suffer[ed] severe emotional injury without physical injury, this Court has typically awarded . . . $1.5 million." *Harrison v. Republic of Sudan*, 882 F.Supp.2d 23, 49

(D.D.C. 2012) (citing *Valore II*, 700 F.Supp.2d at 85). *See also Peterson II*, 515 F.Supp.2d at 56; *Brown v. Islamic Republic for Iran*, 872 F.Supp.2d 37, 42 (D.D.C. 2012); *O'Brien*, 853 F.Supp.2d at 47. The Special Master finds this baseline an appropriate award as there is no evidence in the record compelling a departure either for Dvora Kazsemacher or Chaya Alkareif.

### Solatium Damages

Dvora and Chaya's prayers for solatium raise issues of first impression in the context of the Foreign Sovereign Immunities Act. To date, FSIA solatium claims have been filed by family members not in proximity the terrorist activity. Dvora and Chaya, however, were together during the attacks. As such, each was a victim potentially entitled to recover for her own pain and suffering as well as a victim with a potentially colorable claim to recover for the emotional trauma they endured as a result of the "extreme and outrageous conduct" visited on the other.

Solatium damages are designed "to compensate persons for mental anguish, bereavement and grief that those with a close personal relationship to a decedent experience as well as the harm caused by the loss of the decedent's society and comfort." *Roth v. Islamic Republic of Iran*, 78 F.Supp.3d 379, 402 (D.D.C. 2015) (quoting *Oveissi v. Islamic Republic of Iran*, 768 F.Supp.2d 16, 25 (D.D.C. 2011)) (internal quotation marks and alterations omitted). Solatium awards have "also been applied to cases where the victim survived a terrorist attack." *Oviessi*, 768 F.Supp.2d at 26 n. 10. Unlike lost wages which may easily be calculated, however, solatium damages do not readily lend themselves to quantification using "models and variables." *Elahi v. Islamic Republic of Iran*, 124 F.Supp.2d 97, 111 (D.D.C. 2000) (*quoting Flatow v. Islamic Republic of Iran*, 999 F.Supp.2d 1, 32 (D.D.C. 1998)). Courts, therefore, look for guidance in "prior decisions." *Acosta v. The Islamic Republic of Iran*, 574 F.Supp.2d 15, 29 (D.D.C. 2008).

A review of "prior decisions" reveals that family members in direct lineal relationship are "presume[d] . . . to suffer compensable mental anguish[,] . . . and testimony proving a close emotional relationship will usually be sufficient to sustain an award of solatium damages." *Kim v. Democratic People's Republic of Korea*, 87 F.Supp.3d 286, 290 (D.D.C. 2015) (quoting *Oveissi*, 768 F.Supp.2d at 25). This presumption of mental anguish arises in light of terrorists' acknowledged aim of causing "the highest degree of emotional distress, literally, terror in their targeted audience." *Stethem*, 201 F.Supp.2d at 89.

For family members of deceased victims of terrorism, this Court has established a framework whereby the amount of the award is contingent upon the "'nature of the relationship' between the family member and victim" as well as "'the severity of the pain suffered by the family member.'" *Heiser I,* 466 F.Supp.2d at 269 (quoting *Haim*, 425 F.Supp.2d at 75). To lend uniformity to the analysis and avoid disparity, this Court has approved the following awards: $8 million for spouses; $5 million for parents and $2.5 million for siblings. *Id.* Children of a deceased victim typically receive an award of $3 million. *O'Brien*, 853 F.Supp.2d at 46–47.

For relatives of surviving victims who have been physically injured as a result of terrorist attacks, courts have applied a similar framework whereby "awards are 'valued at half of the awards to family members of the deceased' – $4 million, $2.5 million and $1.25 million to spouses, parents, and siblings, respectively," *Anderson v. Islamic Republic of Iran*, 839 F.Supp.2d 263, 266 (D.D.C. 2012) (quoting *Oveissi*, 768 F.Supp.2d at 26 n. 10 (D.D.C. 2011)), and $1.5 million for children. *Id.*, 839 F.Supp.2d at 266. *Cf. Onsongo v. Republic of Sudan*, 60 F.Supp.3d 144, 151 (D.D.C. 2014) (awarding $2.5 million to children of injured victims of terrorism); *Peterson II*, 515 F.Supp.2d at 51) ($2.5 million to child of injured victim). Finally, this Court has held that relatives of surviving victims presenting with emotional trauma and no

physical injury should receive amounts proportionally less than those with physical injuries, namely, $1 million for spouses; $850,000 for parents; $750,000 for children, and $500,000 for siblings. *See Davis v. Islamic Republic of Iran*, 882. F.Supp.2d 7, 16 (D.D.C. 2012).

The testimony given by Dvora amply reveals the emotional anguish she experienced as a result of trauma experienced by her daughter, Chaya. She recounts how "very frightened" she was when a rocket landed near to Chaya when she was outside; how distressed she was that Chaya became "a different person" after the "incident"; and how Chaya's "fear, stress and insecurity" weighed heavily on her.

Chaya's testimony reveals that she feared for her "elderly parents" and was concerned about "stressful, anxious environment" in which they were living. Chaya relates her distress finding her mother "hysterically crying" upon her return following the rocket attack. She recounts how during her time away from Tzfat, she feared that "something had happened to them" and, despite their reassurances to the contrary, was concerned all was not well.

On this evidence, the Special Master finds that both Dvora and Chaya have colorable claims to an award of solatium damages arising from the injuries suffered by the other. In considering an appropriate amount for such an award, the Special Master is mindful that it is "inappropriate for the solatium awards of family members to exceed the pain and suffering awards of the surviving servicemen." *Fain III v. Islamic Republic of Iran*, 885 F. Supp. 2d 78, 82 (D.D.C. 2012) (citing *O'Brien*, 853 F.Supp.2d at 47). In deference to this principle, the Special Master will adhere to the monetary guidelines established in *Davis*.

**Economic Loss**

Dvora also seeks remuneration for economic losses she allegedly suffered due to the Hezbollah bombing. Supporting Dvora's request are statements she made in her Supplemental

Declaration, Corrected Supplemental Declaration and Second Corrected Supplemental Declaration as well as financial records and an explanatory letter tendered by her accountant.

Section 1605A(c) contemplates recovery of economic damages. *See Moradi v. Islamic Republic of Iran*, 77 F.Supp.3d, 57, 71 (D.D.C. 2015) ("as a general rule, lost earnings – past and future – are compensable damages"). Such damages, however, must be proven "by a reasonable estimate," *Reed v. Islamic Republic of Iran,* 845 F.Supp.2d 204, 213 (D.D.C.2012), supported by corroborative evidence. *See Wyatt v. Syrian Arab Republic*, 908 F. Supp. 2d 216, 230 (D.D.C. 2012) (where this Court denied claims of economic harms where "plaintiffs [] failed to introduce any evidence of what costs specifically were incurred"; sought damages for a "lost business opportunity" based on a "speculative" conjecture; and sought reimbursement for "travel expenses" without "any evidence supporting this claim").

Dvora supplied the art gallery's financial "spreadsheets" for years 2005, 2006 and 2007. Although the specific categories of expenses outlined in these reports were written in Hebrew, it is not difficult to distinguish which numbers represent the gross income for each month and which capture the net. In addition, Dvora attached a letter, also in Hebrew, from her accountant certifying both to the accuracy of the numbers contained in these statements as well as to the fact that these records were identical to those supplied to the Israeli tax authorities. Plaintiffs' counsel supplied an English version of the letter which it represents to be an accurate translation. What is evident from these records is that the income generated by Dvora's gallery in July and August 2006 was substantially less than for the same periods in 2005 and 2007 – a finding that comports with the fact that Tzfat was being shelled on a regular basis during those months in 2006.

The Special Master is satisfied that the amount Dvora seeks in compensation is neither "speculative" nor "conjectural" and that she has demonstrated to a "reasonable certainty" an entitlement to remuneration.

**CONCLUSION**

In light of the foregoing, the Special Master recommends that Dvora Kaszemacher receive One Million Five Hundred Dollars ($1,500,000) and that Chaya Alkareif receive One Million Five Hundred Dollars ($1,500,000) as compensatory damages for pain and suffering. The Special Master further recommends that Dvora Kaszemacher receive Eight Hundred and Fifty Thousand Dollars ($850,000) and Chaya Alkareif receive Seven Hundred and Fifty Thousand Dollars ($750,000) in compensatory damages for loss of solatium. Finally, the Special Master recommends that Dvora Kaszemacher receive Eleven Thousand Nine Sixty Six Dollars and Sixty Seven Cents ($11,966.67) in economic damages.

Dated: April 5, 2016                                        Respectfully submitted,

                                                            By:/s/ Alan L. Balaran
                                                            Alan L. Balaran, Esq.
                                                            Special Master