**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-----------------------------------------------------------X

CHAIM KAPLAN, et al.,

                    Plaintiff,              **REPORT AND RECOMMENDATION**

     v.                                   19-cv-3187 (BMC) (ST)

HEZBOLLAH

                    Defendants.
-----------------------------------------------------------X

**TISCIONE, United States Magistrate Judge:**

Before this Court is a motion by Plaintiffs for default judgment against the Defendant Hezbollah, a U.S. designated foreign terrorist organization, for violations of the Antiterrorism Act, 18 U.S.C. § 2331 *et seq.* Plaintiffs' claims arise out of injuries they suffered during rocket and missile attacks carried out by Hezbollah in Israel between July 12 and August 14, 2006 ("the rocket attacks"). For the reasons below, I recommend Plaintiffs' motion be DENIED for lack of personal jurisdiction.

## BACKGROUND

### I.    Factual Background

Unless otherwise specified, the following facts are taken from Plaintiffs' complaint.

Plaintiffs seeking relief in this matter are U.S. citizens. Pl. Am. Compl. ¶ 4, ECF No. 5; Pl. Br., 9, ECF No. 112. Between July 12, 2006 and August 14, 2006, Hezbollah fired thousands of rockets and missiles at civilians in northern Israel. Pl. Am. Compl. ¶ 29, ECF No. 5. Plaintiffs were in northern Israel at the time.

Many of the Plaintiffs were injured in rocket attacks on July 13, 2006.

Plaintiff Chaim Kaplan was injured by two rockets fired by Hezbollah into the town of Safed in northern Israel.  The first of the two rockets landed next to his car, injuring him, while the second rocket struck his family home and injured his wife, Rivka Kaplan, and the Kaplans' minor children.  As a result of the rocket attack, the Kaplans and their children suffered severe physical, psychological, emotional, and financial injuries. *Id.* at ¶ 31.

Plaintiffs Avishai Reuvane and Elisheva Aron were injured by a rocket also fired by Hezbollah at Safed, which caused them severe physical, psychological, emotional, and financial injuries. *Id.* at ¶ 32.

Plaintiff Chayim Kumer suffered a nervous breakdown as a result of the rocket attacks and was hospitalized, which also caused harm to his wife, Plaintiff Nechama Kumer. *Id.* at ¶ 33.

Plaintiffs Karen and Brian Ardstein were at their family's home in Safed during the rocket attacks.  Karen was pregnant at the time the attacks began and suffered a miscarriage due to the stress caused by the rockets landing near her home.  After the miscarriage, she suffered post-partum depression, damage to her immune system, and other medical complications. Brian was traumatized by the rocket attacks and the loss of the baby.  He also lost his ability to work as a licensed tour guide due to the collapse of tourism caused by the rocket attacks.  The Ardsteins' minor children all suffered emotional and psychological trauma because of the rocket attacks and have been diagnosed with permanent and severe emotional disorders. *Id.* at ¶ 35.

At approximately 7:00 PM on July 13, 2006, a rocket fired by Hezbollah landed outside the home of Plaintiff Laurie Rappeport in Safed.  Her minor daughter, who was playing outside, was blown into the air by the explosion.  She was hospitalized and suffered severe psychological trauma.  Plaintiff Rappeport was emotionally distraught over her daughter's injury. *Id.* at ¶ 36.

Meanwhile, an additional Hezbollah rocket landed a few meters away from Plaintiff Chaya Katzmacher.  The incident caused her psychological and emotional injury. *Id.* at ¶ 40.

Days later, on July 19, 2006, Hezbollah rockets hit an art gallery, owned by Plaintiffs Yair and Orna Mor in Safed.  The business was destroyed and the couple were traumatized. *Id.* at ¶ 37.

On August 11, 2006 at approximately 1:15 PM, a Hezbollah-fired rocket landed on Plaintiff Mikimi Steinberg's house in Safed, severely damaging the house and destroying the possessions therein.  Plaintiff Steinberg suffered severe financial damages as a result. *Id.* at ¶ 41.

Additionally, that summer, multiple Plaintiffs suffered financial losses as a result of the complete halt in tourism that took place due to the rocket attacks.  Plaintiffs Theodore and Maurine Greenberg were proprietors of a tourism business in Safed, which was affected by the loss of tourism. *Id.* at ¶ 38.  Plaintiffs Jacob Katzmacher and Deborah Chana Katzmacher, who owned an art gallery in Safed, were also financially harmed by the halt in tourism. *Id.* at ¶ 39. Additionally, Plaintiff Jared Sauter, who was the owner of a tourism business in the town of Rosh Pina in the Galilee, was harmed by the halt in tourism which negatively affected his business. *Id.* at ¶ 42.

## II.    Procedural History

This case has a long procedural history, the relative portions of which are summarized below.

This action was originally filed in federal court in the District of Columbia, naming Hezbollah, the Democratic People's Republic of Korea, as well as unidentified officials, employees, and agents of North Korea as Defendants. See Pl. Compl., ECF No. 1.  It alleged, among other things, violations of the Antiterrorism Act (ATA) and the Foreign Sovereign

Immunities Act by the Defendants. *Id.* The first amended complaint, the operative complaint in this action, was filed on December 15, 2009. Pl. Am. Compl., ECF No. 5.

Plaintiffs had difficulty effecting service upon Hezbollah, but eventually did so in compliance with the D.C. Court's order to serve them by serving Hezbollah's television station, al Manar, and two other Hezbollah entities, al-Nour radio and the Lebanese Media Group, by international courier. Pl. Br., 2, ECF No. 112. Hezbollah's default was entered on February 11, 2011. Def. Judg., ECF No. 30. Plaintiffs also filed a related action against the Republic of Iran and others in the D.C. Court.

On August 20, 2013, the D.C. Court, *sua sponte*, dismissed Plaintiffs' ATA claims against Hezbollah citing the "act of war" exception contained in the ATA. *See* D.D.C. 08/20/13 Opinion, ECF No. 50. Plaintiffs appealed that decision after final judgment was entered as to North Korea under the FSIA, and the D.C. Circuit Court vacated the dismissal of the Plaintiffs' ATA claims against Hezbollah because the D.C. District Court had impermissibly reached the merits issue of the act of war exception before considering the issue of personal jurisdiction. *See Kaplan v. Cent. Bank of the Islamic Republic of Iran,* 896 F.3d 501, 509-514 (D.C. Cir. 2018). The case was remanded for the D.C. District Court's determination on the issue of personal jurisdiction. *Id.* at 516.

On July 14, 2014, the D.C. District Court found North Korea liable under FSIA § 1605A for Plaintiffs' injuries resulting from the Hezbollah rocket attacks, as a state sponsor of the terror. D.D.C. 07/23/14 Order and Opinion, ECF Nos. 56, 57. On October 1, 2014, the D.C. Court appointed a Special Master to assess the damages Plaintiffs incurred because of the rocket attacks. D.D.C. 10/01/14 Order, ECF No. 58. The Special Master submitted findings and recommendations, and the D.C. District Court issued its opinion regarding damages Plaintiffs

were entitled to from North Korea under the FSIA. D.D.C. 09/30/16 Opinion, ECF No. 83; Pl.

Br., 8-9, ECF No. 112.

On October 23, 2018, Plaintiffs requested that the D.C. District Court sever their ATA

claims against Hezbollah from the rest of the action and transfer it to the Eastern District of New

York. Pl. Mot. to Transfer, ECF No. 94.  Plaintiffs requested this because they believed they

could better establish personal jurisdiction in the Eastern District of New York because of

precedential cases here. *Id.*  The D.C. Court agreed to sever the ATA claims against Hezbollah

and transfer them to the Eastern District of New York. D.D.C. 05/14/19 Order and Opinion, ECF

Nos. 97-98.  Therefore, the only claims before this Court are the ATA claims against Hezbollah.

In its decision, the D.C. Court also noted, "In October 2018, the President Signed the Anti-

Terrorism Clarification Act of 2018 (ATCA) into law, which amended the ATA to eliminate the

'act of war' defense in new or pending ATA actions where the attack at issue was carried out by

a designated 'foreign terrorist organization'...making the act-of-war exception no longer

applicable in this case." *Id.* at 3.

After transfer, this Court issued an order dismissing the case *sua sponte* for failure to

prosecute.  Plaintiffs had taken no action on the case from the time of transfer, May of 2019,

until February 14, 2020, when the Hon. Brian M. Cogan ordered Plaintiffs to show cause why

the case should not be dismissed as abandoned.  In their response, Plaintiffs indicated that they

were still not sure whether personal jurisdiction existed in the Eastern District of New York and

added that they "may wind up deciding to discontinue the case against Hezbollah." E.D.N.Y.

02/24/20 Order and Opinion, ECF No. 103.  Accordingly, Judge Cogan dismissed the case under

Rule 41(b) of the Federal Rules of Civil Procedure. *Id.*

Plaintiffs then appealed that dismissal to the Second Circuit, which vacated this Court's judgment, not on the merits of the dismissal, but because it viewed the Court's analysis of the five Rule 41(b) factors insufficient. The Second Circuit then remanded the case. 2d Cir. 04/22/21 Order, ECF No. 106.

Subsequently, on May 13, 2021, Plaintiffs moved for an entry of default judgment against Hezbollah who have not appeared or responded in the action.

## LEGAL STANDARD

Under Rule 55 of the Federal Rules of Civil Procedure, a Plaintiff may obtain a default judgment where the Defendant has failed to plead or otherwise defend an action. FRCP R. 55(a). Where the Defendant has failed to plead or otherwise defend an action, the Clerk of Court must enter the party's default. *Id.* After default has been entered, and the Defendant does not appear to move to set aside the default, the Plaintiff must then apply to the Court for a default judgment. FRCP R. 55(b)(2).

Courts should, as a threshold matter on a default judgment motion, assure themselves that they have subject matter and personal jurisdiction over the case and Defendant. *See Sinoying Logistics PTE Ltd. v. Yi Da Xin Trading Corp.,* 619 F.3d 207, 213 (2d Cir. 2010) ("Before a court grants a motion for default judgment, it may first assure itself that it has personal jurisdiction over the defendant"); *Hamburg-Sud N. Am., Inc. v. Bomix Industria de Embalagens Ltds.,* No. 15-CV-4774, 2017 WL 9482108, at *4 (E.D.N.Y. Nov. 3, 2017) (*adopted by* 2017 WL 6606896 (E.D.N.Y. Dec. 26, 2017)) ("[B]efore a court grants a motion for default judgment, it may *sua sponte* assure itself that it has subject matter-jurisdiction over the proceeding.").

On a motion for default judgment, the Defendant is deemed to have admitted to all well-pleaded allegations of liability in the complaint. *Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty*

*Corp.*, 973 F.2d 155, 158 (2d Cir. 1992).  To be well-pleaded, the Court must find the Plaintiffs'

factual allegations in their complaint, when accepted as true, establish liability as a matter of law.

*Finkel v. Romanowicz,* 577 F.3d 79 (2d. Cir 2009).  At the default stage, "[t]he legal sufficiency

of [a plaintiff's allegations] is analyzed under the familiar plausibility standard enunciated in *Bell*

*Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662, 678

(2009)." *Liberty Mut. Ins. Co. v. Project Tri-Force, LLC*, No. 18-CV-427 (AJN), 2019 WL

1349720, at \*2 (S.D.N.Y. Mar. 26, 2019) (citing *Belizaire v. RAV Investigative and Sec. Servs.,*

*Ltd.*, 61 F. Supp. 3d 336, 344 (S.D.N.Y. 2014)); *accord Belichenko v. Gem Recovery Sys.*, No. 17-

CV-1731 (ERK) (ST), 2017 WL 6558499, at \*2 (E.D.N.Y. Dec. 22, 2017) (citing *Priestley v.*

*Headminder, Inc.*, 647 F.3d 497, 506 (2d Cir. 2011) and *Zapolski v. Fed. Republic of Germany*,

No. 09-CV-1503 (BMC) (LB), 2009 WL 5184325, at \*1 (E.D.N.Y. Dec. 28, 2009)). *Twombly* and

*Iqbal* command that all elements of the Plaintiffs' claim must be plausibly alleged in the complaint,

such that the complaint contains more than "naked assertions," or allegations that amount to "sheer

possibility," containing instead "factual content that allows the court to draw the reasonable

inference that the Defendant is liable for the misconduct alleged." *Iqbal,* 556 U.S. at 678 (*quoting*

*Twombly*, 550 U.S. at 557).

## DISCUSSION

I.  **This Court Has Subject Matter Jurisdiction Over the Case, But Not Personal Jurisdiction Over the Defendant**

   a.  **Subject Matter Jurisdiction**

   Subject matter jurisdiction is easily established in this case.  As the claims in this case

arise under the ATA, a federal statute, this Court has the authority to hear it under Article III of

the United States Constitution.

**b.**        **Personal Jurisdiction**

Personal jurisdiction in this case is a much closer question.  The ATA itself contains a jurisdictional clause: "Any national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs, may sue therefor in any appropriate district court of the United States…" 18 U.S.C. § 2333(a). Thus, in an ATA case, to exercise personal jurisdiction lawfully, the Court must assure itself of three requirements: "First, the Plaintiff's service of process upon the Defendant must have been procedurally proper. Second, there must be a statutory basis for personal jurisdiction that renders such service of process effective…Third, the exercise of personal jurisdiction must comport with constitutional due process principles." *Waldman v. PLO,* 835 F.3d 317, 327 (2d Cir. 2016) (quoting *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 59-60 (2d Cir. 2012)). In this case, the D.C. District Court ensured proper service of Hezbollah prior to severance of this claim, and this Court finds no defect with the service effected. Therefore, the question of personal jurisdiction turns on the requirements of due process.

The U.S. Constitution's Due Process Clause imposes requirements for personal jurisdiction to be proper.  It requires any jurisdictional exercise to be consistent with "traditional notions of fair play and substantial justice." *International Shoe Co. v. Washington,* 326 U.S. 310 (1945).  That requires that the Defendant "have certain minimum contacts [with the forum] …" *Id.* at 316.

When a civil case arises under federal law and a federal statute authorizes nationwide service of process (as the ATA does), many jurisdictions, including the Southern District of New York, have held that the Court should assess minimum contacts for a personal jurisdiction inquiry as contacts with the United States as a whole, instead of with New York State in

particular. *See Dennis v. JPMorgan Chase & Co.*, 345 F. Supp. 3d 122, 126-27 (S.D.N.Y. 2018); 18 U.S.C. § 2334(a). *See also Burnett v. Al Baraka Inv. & Dev. Corp.,* 349 F.Supp.2d 765 (S.D.N.Y. 2005) ("Courts asked to analyze personal jurisdiction under the ATA's national service of process provision have concluded…the relevant inquiry under such circumstances is whether the defendant has minimum contacts with the United States as a whole…" (internal quotations omitted)).  I recommend the Court adopt this broader approach here given the holdings of our sister court in the Southern District, and because an analysis under this broader approach will show that the locality of contact analysis is immaterial to a decision on this motion.

There are two types of personal jurisdiction: general and specific.  Here, Plaintiffs do not claim there is general jurisdiction over Hezbollah in the United States, which would require "continuous and systematic" contacts. *Id.* at 317.  Instead, their claim is one of specific jurisdiction, which focuses on the "affiliation[n] between the forum and the underlying controversy." *Goodyear Dunlop Tires Operations S.A. v. Brown,* 564 U.S. 915, 919 (2011). "The inquiry whether a forum [] may assert specific jurisdiction over a nonresident defendant focuses on the relationship among the Defendant, the forum, and the litigation." *Walden v. Fiore*, 571 U.S. 277, 283-84 (2014).  "The relationship between the Defendant and the forum 'must arise out of contacts that the Defendant himself creates with the forum.'" *Waldman,* 835 F.3d at 335 (quoting *Walden,* 571 U.S. at 1122).  "[Specific personal jurisdiction requires] the Defendant [to have] purposefully availed itself of the privilege of doing business in the forum…" *Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking Grp. PLC*, 22 F.4th 103 (2d Cir. 2021). Additionally, and importantly, for minimum contacts to exist such that a court may examine the fairness of hearing a claim in the forum state, the claim must arise out of, or relate to, the

Defendant's contacts with the forum. *Licci v. Lebanese Canadian Bank,* 732 F.3d 161, 170 (2d Cir. 2013) (quoting *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez,* 305 F.3d 120, 127 (2d Cir. 2002)).

Specifically, Plaintiffs argue that this Court has personal jurisdiction over Hezbollah through the "conspiracy theory of jurisdiction" recognized by the Second Circuit. *See* Pl. Br., 5. In *Charles Schwab Corp. v. Bank of Am. Corp.,* the Second Circuit held that a co-conspirator's minimum contacts can allow for specific personal jurisdiction over a Defendant where: "(1) a conspiracy existed; (2) the Defendant participated in the conspiracy; and (3) a co-conspirator's overt act in furtherance of the conspiracy had sufficient contacts with a state to subject that co-conspirator to jurisdiction in that state." 883 F.3d 68, 87 (2d Cir. 2018). In *Schwab* itself, the Second Circuit declined to find the conspiracy theory of jurisdiction satisfied because, though certain Defendants made sales in the forum state, those transactions had "nothing to do with" the actual conspiracy that the harm derived from. *Id.*

At the outset, I note that *Schwab* was not an ATA case, but a fraud and securities case. That does not, however, mean the conspiracy theory of jurisdiction could not apply to the ATA if such an application comported with the Due Process Clause. Indeed, the Second Circuit has re-affirmed the conspiracy theory of jurisdiction in more general terms, writing, "A defendant can 'purposefully avail itself of a forum' through the action of a third party by 'directing agents or distributors to take action there'…Much like an agent who operates on behalf of, and for the benefit of, its principal, a co-conspirator who undertakes action in furtherance of the conspiracy essentially operates on behalf of, and for the benefit of, each member of the conspiracy." *Schwab Short-Term Bond Mkt. Fund,* 22 F.4th at 122.

Thus, if a terrorist conspirator took action in the United States in furtherance of the act that harmed Plaintiffs, and his or her presence in the U.S. was enabled or directed by the co-conspirator Defendant, it would satisfy the Due Process Clause to exercise personal jurisdiction over the Defendant.  In other words, Plaintiffs still need two things for personal jurisdiction based on conspiracy in an ATA case: purposeful availment of the forum by the actual Defendant and acts committed by the co-conspirator in the forum in furtherance of the actual harm the Plaintiffs suffered.

Here, Plaintiffs argue the minimum contacts of Hezbollah are established by a co-conspirator named Alexei Saab's acts in the United States.  Plaintiffs have attached to their brief a sealed criminal complaint against Mr. Saab filed in New York State and apparently made public during a related civil proceeding. Saab Compl., ECF No. 112-2.  That complaint charges Mr. Saab with, in relevant part, provision of material support to Hezbollah, conspiracy to provide material support for Hezbollah, receipt of military-type training from Hezbollah, and conspiracy to receive such training. *Id.*

The criminal complaint alleges, in relevant part, that Hezbollah first recruited Mr. Saab in 1996. *Id.* at ¶ 17.  Saab joined the IJO, Hezbollah's external intelligence and terror unit, in 2000. *Id.*  Saab trained with the IJO from 2000 until 2005, which involved learning how to conduct surveillance and learning how to build explosives. *Id.* at ¶ 21.  During his training, Saab was also assigned missions to conduct in various parts of the world including the United States.  In approximately 2003, Saab was assigned a mission by his Hezbollah handler to surveil certain "hot spots" in New York City and to surveil and gather intelligence about those spots for the IJO. *Id.* at ¶ 24.  That surveillance included seeking out structural weaknesses on landmarks, investigating the means of maximizing damage in a potential bomb attack, and assessing how

11

close in proximity one could get to a landmark. *Id.*  Saab understood that that information would be used by the IJO to calculate the size and manner of explosive required to attack these targets. *Id.*  The targets Saab surveilled included the U.N. Headquarters, the Statue of Liberty, and J.F.K. Airport. *Id.*  Saab produced a detailed report which was provided to his handler. *Id.*  According to the criminal complaint, Saab took similar actions in other U.S. cities including Boston, Massachusetts, and Washington D.C. *Id.* at ¶ 26.

Sometime between 2003 and 2005, Saab, while in Lebanon, was instructed to steal a car, which he and his handler drove to a small field outside Beirut where a van was parked.  There, Saab was given a gun and was instructed to shoot a person inside the van twice in the stomach and once in the head.  Saab walked up to the individual and pulled the trigger of the gun twice, but the gun did not fire.  Saab later came to believe this individual was an Israeli spy. *Id.* at ¶ 32.

Plaintiffs argue that Saab's acts were part of a conspiracy with Hezbollah to engage in "brutal terrorist violence…against both the State of Israel and the United States for nearly 40 years, which has resulted in the murder of hundreds of American and Israeli citizens, and the maiming of thousands more." Pl. Br., 6, ECF No. 112.  They argue the rocket attacks which injured Plaintiffs were part of that conspiracy, as were Saab's actions.  Therefore, Plaintiffs argue, "Since Saab conducted his activities in furtherance of the Hezbollah conspiracy while physically present in the United States, his 'overt acts in furtherance of the conspiracy' unquestionably 'had sufficient contacts' to subject him to U.S. jurisdiction, as required by *Schwab.*" *Id.* at 7.

I agree with Plaintiffs that Hezbollah itself constitutes a terrorist conspiracy and that Mr. Saab's actions were in furtherance of that terrorist conspiracy.  I also agree that the criminal complaint clearly shows a conspiracy between Hezbollah and Saab, in which Hezbollah

purposefully created minimum contacts with the United States by sending Saab here to perform reconnaissance.  But that is as far as the conspiracy theory of jurisdiction gets Plaintiffs in this case.  Due process also requires, for personal jurisdiction over a defendant, that Plaintiffs' claim arise out of, or relate to, the Defendant's contacts with the forum.

Here, the anchor contacts for Hezbollah are their co-conspirator's acts in the United States.  But Plaintiff has not demonstrated anywhere that the Hezbollah rocket attacks in Israel in July and August of 2006 which actually injured Plaintiffs arose out of or related to Saab's surveillance of U.S. landmarks as terror targets.  Without that connection between the contacts and the event that actually harmed Plaintiffs, the Court cannot exercise personal jurisdiction under the Due Process Clause.

Two pivotal Second Circuit cases specifically address the precise jurisdictional problem at issue here.  In *Waldman v. PLO*, the Second Circuit considered whether there was specific personal jurisdiction under the ATA over terrorist defendants from the Palestinian Liberation Organization.  In that case, eleven American families sued the Palestinian Liberation Organization and the Palestinian Authority for terror attacks that occurred in Israel and killed or wounded the Plaintiffs and/or their family members.  There, the Second Circuit held that the "'suit related-conduct' – here, the terror attacks in Israel – [must] have a 'substantial connection with the forum.'" *Waldman,* 835 F.3d at 341 (quoting *Walden v. Fiore,* 571 U.S. 277 (2014)).  Plaintiffs attempted to argue the anchor contacts the Defendants had, their lobbying efforts in Washington D.C., provided sufficient minimum contacts in the United States.  The Second Circuit found otherwise, holding that "[t]he Defendants' Washington mission and its associated lobbying efforts do not support specific personal jurisdiction on the ATA claims. The Defendants cannot be made to answer in this forum 'with respect to matters unrelated to the forum

connections.'" *Waldman*, 835 F.3d at 341 (quoting *Goodyear*, 564 U.S. at 923).  The Second Circuit also noted, in supporting its holding, the D.C. District Court's reasoning in *Estate of Klieman v. Palestinian Authority,* where that court required that "the Plaintiff show some sort of causal relationship between a defendant's U.S. contacts and the episode in suit." 82 F. Supp. 3d 237, 247 (D.D.C. 2015).

In *Licci v. Lebanese Canadian Bank,* the Second Circuit did find personal jurisdiction in an ATA action.  There, the plaintiffs included U.S. citizens who were injured or whose family members were killed in Hezbollah rocket attacks outside the United States.  They sued a Lebanese bank with no operations, branches, or employees in the United States.  The Court had personal jurisdiction in that case, the Second Circuit held, because the Bank itself allegedly facilitated the attacks that injured the plaintiffs, by using a corresponding bank account at a New York bank to effectuate millions of dollars in wire transfers on Hezbollah's behalf. *Licci v. Lebanese Canadian Bank,* 732, F.3d 161, 164-66 (2d Cir. 2013).  Plaintiffs alleged that the money flowing through the New York bank was used to carry out the specific attacks which injured them.  The nexus between the contacts within the United States and the harm existed in that case because the money that was allegedly used by Hezbollah to fund and effectuate the rocket attacks that injured plaintiffs was wired by the Defendant through a New York bank. Thus, the Defendant's own deliberate actions undertaken in the forum state were found to be directly connected to the terrorist acts that injured plaintiffs.  No such nexus exists here.  The minimum contacts of Saab, his surveillance operations in the United States, have not been shown to relate in any way to Hezbollah's 2006 rocket attacks in Israel.

Based on the above analysis, this Court does not have personal jurisdiction over the Defendant Hezbollah for claims stemming from the 2006 rocket attacks in Israel.

This does not mean, however, that no U.S. court has personal jurisdiction over these claims: I merely find that, on the record submitted by Plaintiffs, no personal jurisdiction exists. It may well be that agents of Hezbollah or Hezbollah itself utilized the United States in some way in the planning, preparation, or execution of these 2006 rocket attacks such that personal jurisdiction would be proper.  But Plaintiffs have thus far failed to properly allege that nexus.

Congress enacted the ATA with the intent that those harmed by terror attacks abroad would have recourse in the U.S. courts.  Setting the personal jurisdictional bar anywhere above the minimum required by the Due Process Clause would be anathema to Congress' intent in enacting the ATA.  Plaintiffs have been harmed by unconscionable acts and should those acts have a nexus with the United States sufficient to satisfy our Constitution, there should be recourse here for them.  Nevertheless, the allegations in the complaint before this Court simply do not pass constitutional muster under the Due Process Clause.

As I recommend finding a lack of personal jurisdiction, the Court should not reach the merits of this action.  I recommend denial of the motion for default judgment only on the grounds of lack of personal jurisdiction over the Defendant.

## CONCLUSION

Based on the foregoing, I recommend the Court deny Plaintiffs' motion for default judgment.

15

## OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b)(2) of the Federal Rules of Civil

Procedure, the parties shall have fourteen (14) days from service of this Report and

Recommendation to file written objections. Failure to file timely objections shall constitute a

waiver of those objections both in the District Court and on later appeal to the United States

Court of Appeals. *See Frydman v. Experian Info. Sols., Inc.*, 743 F. App'x 486, 487 (2d Cir.

2018); *McConnell v. ABC-Amega, Inc.*, 338 F. App'x 24, 26 (2d Cir. 2009); *Tavarez v. Berryhill*,

No. 15-CV-5141 (CS) (LMS), 2019 WL 1965832, at *30 (S.D.N.Y. May 1, 2019); *see also*

*Thomas v. Arn*, 474 U.S. 140 (1985).

**SO ORDERED.**


                                                    _____/s/_____
                                                    Steven L. Tiscione
                                                    United States Magistrate Judge
                                                    Eastern District of New York


Dated: Central Islip, New York
      February 28, 2022