UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------- X
  CHAIM KAPLAN, *et al.*,                            :
                                                     :   **MEMORANDUM DECISION AND**
                               Plaintiffs,           :   **ORDER**
                                                     :
                 - against -                         :   19-cv-3187 (BMC)
                                                     :
  HEZBOLLAH, *et ano.*,                              :
                                                     :
                               Defendants.           :
-------------------------------------------------------- X

**COGAN**, District Judge.

Foreign bank liquidators have various avenues available to them to allow them to pay

professionals necessary for the administration of the liquidating estate.  If they do not avail

themselves of those protections, they risk creditors of the bank executing on the bank's assets.

That is what happened here.  But the creditors also did not use all available legal steps to

maximize their priority.  Based on both sides' valid but unperfected claims to the account in

question, the Court will exercise its discretion to divide the funds at issue in the manner

described below.


## BACKGROUND

This is an action brought by many United States citizens against the listed Foreign

Terrorism Organization Hezbollah for personal injuries plaintiffs sustained as a result of

Hezbollah missile attacks while plaintiffs were in Israel in 2006.  It is brought under the

Antiterrorism Act ("ATA"), 18 U.S.C. § 2331 *et seq.*, the Foreign Sovereign Immunities Act

("FSIA"), 28 U.S.C. § 1602 *et seq.*, and other related statutes.  The history of the case is

complex, but all that matters here is that I entered default judgment against Hezbollah in the

amount of $111,485,900.01.

Pursuant to Fed. R. Civ. P. 69(a), which incorporates state procedures for the execution of judgments, plaintiffs served a restraining notice under N.Y. C.P.L.R. § 5222 on Standard Chartered Bank of New York.  Standard Chartered was not holding any assets in the name of Hezbollah, but the restraining notice advised it that "by operation of § 201 of the Terrorism Risk Insurance Act of 2002, the assets and property of Jammal Trust Bank SAL ['JTB'] are subject to attachment and execution in satisfaction of the plaintiffs' judgment against HEZBOLLAH." Standard Chartered was and is holding just under $2.5 million in an account belonging to JTB, and has frozen the account pursuant to the restraining notice.[1]

JTB was a Lebanese bank that became subject to sanctions imposed by the Office of Foreign Assets Control ("OFAC") of the United States Department of the Treasury in 2019. OFAC found that JTB "was a means through which" Hezbollah accomplished "a material function," and that JTB "provided material services to, on behalf of, and in support of Hezbollah."  OFAC therefore designated JTB as a Specially Designated Global Terrorist pursuant to Executive Order 13224.  See 84 Fed. Reg. 46782-46783 (Sept. 5, 2019).  Treasury explained that JTB

> knowingly facilitates the banking activities of U.S.-designated entities openly affiliated with Hizballah, Al-Qard al-Hassan and the Martyrs Foundation, in addition to services it provides to Hizballah's Executive Council.  Hizballah has used accounts at Jammal Trust to pay its operatives and their families, and Jammal Trust has actively attempted to conceal its banking relationship with numerous wholly owned Martyrs Foundation subsidiaries.

At that time, a former Assistant Secretary of the Treasury stated that JTB's "facilitation of banking activities for Martyrs Foundation – which funnels money to the families of killed or

---

[1] Standard Chartered takes no position as to the distribution of the funds and has indicated that it is prepared to deliver the funds in accordance with this Court's order.

imprisoned terrorists, including suicide bombers – enables Hizballah to subsidize those who commit acts of violence against innocent victims."

JTB's addition to the OFAC list essentially ended its business as its funds were blocked. The Central Bank of Lebanon (*Banque du Liban*) put it into liquidation and appointed one of its former governors, Muhammad Baasiri, as Liquidator. Baasiri hired an international financial consulting firm to conduct a forensic audit of JTB's accounts. In 2019, OFAC granted an annual license authorizing the Liquidator to pay the consulting firm's fees for this work (which would otherwise have been prohibited by reasons of JTB's assets being blocked), and OFAC has renewed that license every year since.

The consulting firm has communicated extensively with Treasury in connection with its audit. It has issued and delivered to Treasury hundreds of reports. It conducts periodic meetings with OFAC analysts and responds to inquiries about any JTB contacts with other terrorist groups. The consulting firm's work has given Treasury information contributing to further designations by OFAC of other entities and individuals as terrorists or instrumentalities of terrorists. The work is ongoing, and there is in excess of $1.2 million in fees owed to the consulting group that would have been paid but for plaintiffs' restraining notice on Standard Chartered.

Those fees, as well as payment for work going forward, are in limbo as a result of plaintiffs' restraining notice. The Liquidator, operating as JTB, therefore moved before this Court to vacate the restraining notice on the grounds that the consulting firm's "forensic auditing work is in the national security interest of the United States, and others around the world, because it identifies and combats terrorist financing," and that New York law, applicable (again)

through Fed. R. Civ. Pro. 69(a), gives this Court discretion to vacate or modify the restraining notice for equitable reasons.

Plaintiffs have cross-moved for a turnover order under N.Y. C.P.L.R. §§ 5225 and 5227.

## DISCUSSION

Both parties have a viable legal theory to support their claim to the funds in the JTB account.  The Liquidator's argument is easy enough to see – JTB owns the money, it has hired a consulting firm to assist with its liquidation, and it has an OFAC license authorizing payment to the consulting firm.  Moreover, it is undisputed that the funds in the JTB account are not directly traceable to terrorist acts committed by Hezbollah.

Plaintiffs' theory is no less viable but more complex.  Section 201 of the Terrorism Risk Insurance Act of 2002, Pub. L. No. 107-297, 116 Stat. 2322 (2002)[2] provides:

> Notwithstanding any other provision of law . . . in every case in which a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism . . . the blocked assets of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to execution or attachment in aid of execution in order to satisfy such judgment to the extent of any compensatory damages for which such terrorist party has been adjudged liable.

TRIA § 201(a).  The Liquidator does not dispute that Hezbollah is a "terrorist party," and that plaintiffs' judgment is based on "act[s] of terrorism."  See TRIA §§ 201(d)(4); 201(d)(1).

The Liquidator also doesn't dispute that it is "an agency or instrumentality" of Hezbollah. That would be hard to do, considering that Treasury has described JTB's involvement with Hezbollah as follows:

> Jammal Trust knowingly facilitates the banking activities of U.S.-designated entities openly affiliated with Hizballah, Al-Qard al-Hassan and the Martyrs

---

[2] The provisions of TRIA appear in a note of the United States Code (15 U.S.C. § 6701 note) and, therefore, I will refer to the provisions of TRIA by the sections of the law.

> Foundation, in addition to services it provides to Hizballah's Executive Council. Hizballah has used accounts at Jammal Trust to pay its operatives and their families, and Jammal Trust has actively attempted to conceal its banking relationship with numerous wholly owned Martyrs Foundation subsidiaries. When opening purportedly "personal accounts" at Jammal Trust, Al-Qard al-Hassan officials clearly identified themselves to Jammal Trust as senior members of the terrorist group.  Jammal Trust then facilitated these accounts to be used to conduct business on Al-Qard al-Hassan's behalf.  Such a scheme is representative of the deep coordination between Hizballah and Jammal Trust, which dates back to at least the mid-2000s and which spans many of the bank's branches in Lebanon.  Also, Hizballah Member of Parliament Amin Sherri coordinates Hizballah's financial activity at Jammal Trust with the bank's management.

"Treasury Labels Bank Providing Financial Services to Hizballah as Specially Designated Global Terrorist," U.S. Department of the Treasury, March 21, 2023, available at https://home.treasury.gov/news/press-releases/sm760.  Another senior Treasury official commented that

> Jammal Trust maintained a deep relationship with Al-Qard al-Hassan, which Hizballah uses as a commercial cover for some of its financial activity.  Indeed, all senior officials from Al-Qard al-Hassan had to do was identify themselves as such to Jammal Trust, and they were able to open personal accounts through which they conducted Hizballah business.  Jammal Trust Bank's downfall was not brought about by a simple lapse of AML/CFT standards: they knew their customer, and it was Hizballah.

"Remarks by Assistant Secretary Marshall Billingslea on Hizballah and Iran's Illicit Financial Networks," U.S. Department of the Treasury, September 13, 2019, available at https://home.treasury.gov/news/press-releases/sm776.

Similarly, it is undisputed that the account at Standard Chartered holds blocked assets as defined in TRIA § 201(d)(2).

It thus appears that execution on the Standard Chartered account is paradigmatic of the purposes of TRIA.  Congress enacted TRIA to "deal comprehensively with the problem of enforcement of judgments rendered on behalf of victims of terrorism in any court of competent jurisdiction by enabling them to satisfy such judgments through the attachment of blocked assets

of terrorist parties." Weininger v. Castro, 462 F. Supp. 2d 457, 483 (S.D.N.Y. 2006) (quoting

H.R. Conf. Rep. 107-779, at 27 (2002), reprinted in 2002 U.S.C.C.A.N. 1430, at 1434).  Again,

the Liquidator does not contend otherwise.

Having a valid claim under TRIA, however, does not totally resolve the issue.  TRIA §

201 does not provide a specific procedure for obtaining the blocked assets.  It refers to

"execution or attachment in aid of execution," but does not specify how that is to occur.

Logically, we should first look back to New York procedural law as applicable under Rule 69(a).

But that does not completely resolve the issue either.  C.P.L.R. § 5222 provides that a judgment

debtor may serve a restraining notice on a third party "only if, at the time of service," the third

party "owes a debt to the judgment debtor or obligor" or the third party "is in the possession or

custody of property" which the third party "knows or has reason to believe the judgment debtor

or obligor has an interest."  Similarly, C.P.L.R. § 5225(b) provides for a turnover of property "in

which the judgment debtor has an interest."

These statutes do not squarely address our situation.  Standard Chartered certainly is not

indebted to Hezbollah.  And neither is JTB.  Plaintiffs acknowledge that they cannot trace the

JTB funds held at Standard Chartered to Hezbollah as opposed to another terrorist group or even

a non-terrorist depositor.  For this reason, although plaintiffs try to squeeze JTB into the term

"obligor" in C.P.L.R. § 5222, that doesn't work because plaintiffs cannot show that JTB is

obligated to pay that money to Hezbollah.

I have some hesitation in expanding the word "debtor" in the C.P.L.R. to encompass a

federal concept under TRIA that the New York Legislature has never considered.  C.P.L.R. §

5222 does not reference an "instrumentality" of the debtor; it references the debtor or those

obligated to pay the debtor.  At least one federal case has suggested otherwise, see Weininger,

6

462 F. Supp. 2d at 499 ("by operation of TRIA, Cuba's agencies and instrumentalities also become the judgment debtors."), but that case merely assumes its conclusion.

The closest analogy, although involving a common law rather than federal law concept, may be the treatment of alter ego or veil-piercing in the C.P.L.R. § 5222 context. Some courts have suggested that one cannot serve a restraining notice on an alleged alter ego until it is first determined whether the judgment debtor is an alter ego of the party. See Capitol Records, LLC v. Defries, No. 11-cv-6808, 2014 WL 5608137, at *1 (S.D.N.Y. Nov. 4, 2014). But other courts have made that determination in the context of considering the validity of a restraining notice or turnover proceeding when served on an alleged alter ego. See Palestine Monetary Authority v. Strachman, 62 A.D.3d 213, 231, 873 N.Y.S.2d 281 (1st Dep't 2009). Depending on the facts of the particular case, an alter ego might have a closer relationship to the judgment debtor than a mere instrumentality. If prior adjudication of that status must precede service of a restraining notice, one could conclude that instrumentality status under TRIA must also be determined before service of a restraining notice on that alleged instrumentality.

Enforcing a judgment against Hezbollah through restraining JTB's funds and seeking a turnover order is not the only way that plaintiffs could have proceeded. Armed with the right to recover this money under TRIA, plaintiffs could have commenced a separate action against JTB and obtained a prejudgment attachment of the account pending entry of final judgment against JTB. Once JTB became a judgment debtor – and it seems there would have been little opportunity to defend against such an action given the breadth of TRIA – the procedures of C.P.L.R. Article 52 would be unambiguously available to plaintiffs.

Notwithstanding the possibility of a better procedure than that used here, I will uphold the restraining notice. With regard to JTB's status as an instrumentality of Hezbollah, there is

nothing to litigate.  It is not akin to having to prove that a non-debtor is an alter ego; here, the Liquidator does not contest that JTB is an instrumentality under TRIA.  Moreover, the Second Circuit has made clear that state procedures on execution should be reasonably adapted as necessary to conform with federal practice.  See Mitchell v. Garrison Protective Services, Inc., 819 F.3d 636, 641 (2d Cir. 2016).  Finally, as noted above, TRIA was tailor-made for this situation, where it is difficult to enforce a judgment against a terrorist organization, but easier to enforce it against banks which effectively serve as the financing arm of the terrorist organization. See Weinstein v. Islamic Republic of Iran, 609 F.3d 43, 50 (2d Cir. 2010).

However, plaintiffs still have not utilized the proper procedure to enhance the priority of their claim.  Neither the restraining notice nor the motion for a turnover give rise to a judgment lien.  See N.Y. C.P.L.R. § 5222, Practice Commentary, C5222:8 (McKinney 2022).  Had they served a writ of execution on Standard Chartered, they would have a lien, superior in priority to unsecured creditors like the consulting firm hired by the Liquidator.  See N.Y. C.P.L.R. §§ 5202, 5243 (McKinney 2022).  But having failed to do so, it seems to me that the priority of their claim is no higher than that of the consulting firm.

But the Liquidator and the consulting firm have not fully protected themselves either.

First, the Liquidator's counsel candidly acknowledged that despite his efforts, the Liquidator was unable to get OFAC or Treasury to support his motion to vacate the restraining notice.  I can only conclude from this that the consulting firm's work is not so crucial to OFAC that it wishes the firm to continue its efforts, or even to be paid for its prior efforts.  This inference is consistent with the documents the Liquidator has submitted, which purport to show how the consulting firm's work is vital to national security, but in fact merely show that OFAC is appreciative of the consulting firm's work.  Plaintiffs argue that the Liquidator has no standing to

assert U.S. national security interests and, although I do not think it is a question of standing, the Liquidator's assertion of that interest in the absence of any direct communication from OFAC to this Court makes the Liquidator's argument unpersuasive.

Second, this Court is not supposed to resolve priority disputes between competing creditors of an insolvent company.  Chapter 15 of the Bankruptcy Code, 11 U.S.C. § 1501 *et seq.*, allows a "foreign representative" of an insolvent company – which clearly includes the Liquidator here – to file a petition seeking to have the U.S. recognize a foreign insolvency proceeding, and to administer assets of the foreign debtor that are located in the United States. Typically, if the Bankruptcy Court recognizes the foreign proceeding, it will stay any U.S. litigation involving claims against the foreign estate.  The Liquidator has not told me whether the proceeding in Lebanon is judicial or administrative, but even foreign administrative proceedings can receive recognition under Chapter 15.  See 11 U.S.C. § 101(23).

Judge Amon's decision in Bartlett v. Societe Generale de Banque au Liban SAL, No. 19-cv-0007, 2021 WL 3706909 (E.D.N.Y. Aug. 6, 2021), involved JTB operating through the same Liquidator.  (The parties in that case advised Judge Amon much more about the Lebanese proceeding and Lebanese law than did the parties in this case.)  There, the plaintiffs, also victims of Hezbollah terrorism, sought to prevent the Liquidator from intervening in their case against JTB by arguing that the Liquidator's sole remedy was to commence a Chapter 15 proceeding. Because Chapter 15 applies only when the foreign representative seeks "assistance . . . in the United States . . . in connection with a foreign liquidation proceeding," 11 U.S.C. § 1501(b)(1), Judge Amon held that Chapter 15 did not apply.  She reasoned that the Liquidator was merely attempting to defend against the plaintiffs' claims, not to "administer" an insolvent estate.  See Bartlett, 2021 WL 3706909, at *4 ("[T]o decide whether 'assistance is sought . . . in connection

9

with a foreign proceeding,' requires asking whether [the liquidator] through his intervention, seeks assistance 'in enforcing or administering a foreign liquidation proceeding.'" (quoting Trikona Advisers Ltd. v. Chugh, 846 F.3d 22, 31 (2d Cir. 2017))).

Although I agree, for reasons set forth below, with Bartlett's conclusion that Chapter 15 is not the exclusive means by which a foreign representative can appear in a U.S. court, I respectfully disagree with its holding that, in defending against the Bartlett plaintiffs' claims against JTB, the Liquidator was not engaging in "administration" of an insolvent estate. "Administration" is a term of considerable breadth, encompassing anything that a trustee or representative does within the scope of his appointment. In my view, this indisputably includes the trustee or representative's defense of litigation against the estate.

In any event, that distinction is inapplicable here. The Liquidator wants to dissolve a restraining order and opposes giving the money to plaintiffs so that it can give the money to its preferred creditor, the consulting firm. Distributing U.S. funds to creditors is clearly within the scope of administration. See In re Arana, 456 B.R. 161, 171-72 (Bankr. E.D.N.Y. 2011).

As noted above, however, I see nothing in Chapter 15 that makes its invocation mandatory for a foreign representative to appear in U.S. courts. It is supposed to make it easier for the foreign representative to obtain recognition of the foreign proceeding; it applies when the foreign representative "seeks assistance," not when it is merely entitled to seek assistance. Nothing suggests it is an exclusive remedy.

Still, it is not clear why the Liquidator has not commenced a Chapter 15 proceeding. Not only would a stay order block plaintiffs' restraining notice and turnover proceeding, but it would give the Liquidator the opportunity, if the Bankruptcy Court deemed it appropriate, to lift the restraining order and let the Liquidator pay the consulting firm. Indeed, the Liquidator could

have filed a Chapter 11 and possibly claimed an administrative priority for the consulting firm's fees, at least going forward.  It may be that the Liquidator is concerned that the instability of the Lebanese government and courts would preclude Bankruptcy Court recognition of his Lebanese appointment under the Bankruptcy Code.  But whatever the reason for not proceeding in a court that deals exclusively with insolvency matters, the Liquidator has left me the task of sorting out whether plaintiffs or the consulting firm should get paid.

Because the Bankruptcy Code does not apply in this case, the only avenue available to answer that question is C.P.L.R. § 5240.  The statute provides: "The court may at any time, on its own initiative or the motion of any interested person, and upon such notice as it may require, make an order denying, limiting, conditioning, regulating, extending or modifying the use of any enforcement procedure."  There are few state appellate decisions discussing the scope of the power granted by this section, and virtually none that point to specific factors that a court should consider in exercising its discretion.  At least one New York appellate court has recognized that "[t]his section grants [the trial court] broad discretionary power to alter the use of procedures set forth in CPLR article 52," Sirotkin v. Jordan, LLC, 141 A.D.3d 670, 672, 35 N.Y.S.3d 443, 445 (2nd Dep't 2016), but that seems obvious enough from the broad language of the statute itself.

The Second Circuit has noted that C.P.L.R. § 5240 incorporates the general principle of equity that "equity aids the vigilant."  Mikulec v. United States, 705 F.2d 599, 602 (2d Cir. 1983) (citation omitted).  As noted above, however, neither plaintiffs nor JTB have been all that vigilant, as neither have invoked procedures that would have granted them a higher level of protection.

Plaintiffs' claims as injured victims of terrorism may seem more sympathetic.  But sympathy is a dangerous principle to apply, even in equity, as it is unbounded.  Cf. June Medical

Services LLC v. Phillips, ___ F. Supp. 3d ___, 2022 WL 16924100, at *11 (M.D. La. Nov. 14, 2022) (American equity jurisprudence reflects an "effort to restrain the discretion courts of equity once wielded and to roundly reject a view in which equity depends on the length of each chancellor's foot." (internal citation and quotation marks omitted)).  Moreover, no one disputes that the consulting firm has performed professional work for which it expected to be paid.

At the same time, I reject the Liquidator's argument that all of its bills should be paid from the account.  The Liquidator claims that the consulting firm had no reason to suspect a problem until Standard Chartered notified JTB of the retraining notice on January 27, 2023.  But with JTB having been found to be an instrumentality of a listed terrorist organization; placed into liquidation; and with multiple suits against Hezbollah and at least one against JTB itself, somebody's lawyer somewhere should have figured out that unencumbered funds in a JTB bank account in the United States were going to attract attention sooner or later.

The Liquidator's argument that his OFAC license insulated all JTB funds from creditor claims is without merit. The license authorizes payment to the consulting firm – it does not mandate payment. And it certainly does not establish a priority for the consulting firm's work over the claims of other creditors.  The Liquidator relies on its OFAC license; plaintiffs rely on Rule 69 and its incorporation of state law.  Neither side has the better of the argument.

Under these circumstances, with both creditors at the same level of security (or insecurity), the Court will modify the restraining notice and grant the turnover motion to the extent of directing Standard Chartered to pay plaintiffs $1.5 million out of the funds in the JTB account, and further directs that the Liquidator shall use the remaining funds to pay the consulting firm's outstanding invoices, but only for work performed prior to January 27, 2023.

If the Liquidator wishes the consulting firm to continue to provide services, he will need to utilize another source of funds.[3]

**SO ORDERED.**

*Brian M. Cogan*

_____

U.S.D.J.

Dated: Brooklyn, New York
       March 26, 2023

---

[3] Plaintiffs argue that JTB has not shown that it is unable to pay outstanding auditing fees from another source.  In response, JTB claims that "the [Standard Chartered] Account is the sole possible source of funding for JTB's forensic auditors" due to restrictions placed on JTB's assets by Lebanese law and other foreign blocking statutes. Whether alternative funds are available to a party is not a factor I find particularly important.  The issue before me is how to distribute the funds in this particular account – to which both parties have a valid claim.